**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 06-2240**

———————

JEFFREY WILLIAM KUYKENDALL,

                                        Plaintiff - Appellant,

        versus

YOUNG LIFE,

                                        Defendant - Appellee.

———————

Appeal from the United States District Court for the Western District of Virginia, at Roanoke.   Samuel G. Wilson, District Judge.   (7:05-cv-00581-SGW)

———————

Submitted:  October 15, 2007        Decided:  January 9, 2008

———————

Before WILLIAMS, Chief Judge, and TRAXLER and KING, Circuit Judges.

———————

Affirmed by unpublished per curiam opinion.

———————

David D. Walker, P.C., Salem, Virginia; William B. Taylor, IV, Andrew K. Macfarlane, Noel P. McDonell, MACFARLANE, FERGUSON & MCMULLEN, Tampa, Florida, for Appellant.  Frank K. Friedman, Daniel S. Brown, Joshua F. P. Long, WOODS ROGERS, P.L.C., Roanoke, Virginia, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Jeffrey Kuykendall appeals the district court's grant of summary judgment in favor of Young Life on his claims of gross negligence and willful and wanton negligence. Kuykendall brought this action seeking damages for injuries sustained when he fell more than thirty feet from a ropes course operated by Young Life. He contends that the district court erroneously grounded its ruling in Virginia's charitable immunity doctrine. Kuykendall further argues that his fall resulted from several negligent acts and omissions by Young Life that cumulatively amount to gross negligence. Concluding that Kuykendall failed to present evidence from which a reasonable jury could find that Young Life's conduct was either grossly negligent or wilfully and wantonly negligent, we affirm.

## I.

Because this is an appeal from the district court's grant of summary judgment in favor of Young Life, we review the facts in the light most favorable to Kuykendall. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (noting that all evidence must be construed in the light most favorable to the party opposing summary judgment).

### A. Young Life

Young Life is a national "non-denominational, Christian, non-profit organization that is committed to introducing adolescents to

2

Jesus Christ and helping them grow in their faith." (J.A. at 140.) Young Life owns and operates numerous camps, including a facility at Rockbridge Alum Springs, Virginia (hereinafter "Rockbridge"). Campers arrive at camp with their leaders, with whom they share a cabin. The camp program at Rockbridge includes religious learning and instruction, as well as participation in an outdoor "challenge course" that includes a high ropes course. (J.A. at 310.)

The challenge course represents a central part of the camp experience. Young Life intends the course to further various objectives, including helping campers accomplish something they might not have thought they could do, enabling campers to grow closer to each other and to their leaders, and "partner[ing] with the total camp program by demonstrating a part of the 'abundant life' that a relationship with Christ offers." (J.A. at 187.) As part of its efforts to foster the relationship between campers and their leaders, Young Life asks two of the cabin leaders to volunteer to take a station along the ropes course; at their station, the leader-volunteers help campers transfer between the different elements that comprise the course.

B. <u>Kuykendall's Experience with Young Life & His Fall from the Ropes Course</u>

Kuykendall began volunteering for Young Life as a college student and, as a result, became familiar with ropes courses at camps other than Rockbridge. In addition to completing ropes courses on various occasions, Kuykendall once spent five days

3

helping to prepare the course at Young Life's camp in Windy Gap, North Carolina for the summer season. This preparation required him to, among other things, negotiate the entire ropes course, check the tightness of bolts, and trim branches that had grown on the course. Kuykendall also participated in a weekend training program, through which he became certified to act as a "Weekend Wrangler" at the Windy Gap course. He "wrangled" there on a number of weekends beginning in September 2002 and ending in April or May of 2003.

In July 2003, Kuykendall brought a Young Life group from Mooresville High School to Rockbridge. His group set out to complete the ropes course on the Fourth of July. The facilitator on duty, Bernard Newton, requested that two of the group leaders volunteer to assist the campers in transferring between elements, and Kuykendall stepped forward to volunteer. It does not appear that Newton was aware of or inquired about Kuykendall's previous ropes course experience.

Newton provided both volunteers with safety instructions explaining belay transfer techniques and other pertinent information. Part of Newton's safety talk involved a demonstration of Rockbridge's policy of "clipping to the red." This instruction was necessary because certain sections of cable along the course -- namely the "tail end" or "tag end" of the belay cable -- were not load-bearing. Accordingly, Young Life had marked each end of the

4

weight-bearing cables with markers encircled with red tape. Participants were to attach their carabiners to the weight-bearing cable marked in red so that they would be securely tethered to the course. Newton's practice was to "tell everybody to clip between the red." (J.A. at 310.) He would always make clear that participants must hook in between the red markers at either end of the load-bearing cable because that portion of the cable was the safest. In his own words, Newton would consistently "make sure [he] was making it clear to hook in between the reds" and "was always very, very clear about that." (J.A. at 339.) Then, using the cable at the first platform of the ropes course where it "was easy for [participants] to see the red marks," he would demonstrate clipping to the proper portion of the cable. (J.A. at 310.)

Newton's practice was consistent with the procedure taught by Rockbridge's challenge course manager, Ken Hewett. Hewett too would remind campers to "clip to the red" as "a nice little phrase [participants] c[ould] remember" and would demonstrate clipping between the red markers (i.e. beyond the first red taped marker). (J.A. at 493.)[1]

---

[1]In his deposition, Kuykendall was asked whether he remembered being instructed to clip to the red. He responded: "That sounds familiar, I don't know when in the instruction that was told, but clip to the red sounds familiar." (J.A. at 285.) Overall, Kuykendall indicated that his memory of the safety instructions was hazy; he could not remember, for example, whether a man or a woman had instructed him. Subsequently, Kuykendall submitted with his response to Young Life's summary judgment motion an affidavit stating that he had not been made aware that Rockbridge

5

Contrary to Young Life's policy, however, Newton did not accompany Kuykendall to the station where he would be helping the campers do "belay transfers" to see that Kuykendall clipped in properly.[2] Young Life's procedure was for the facilitator to take the volunteer leader to their station and tell them where to stand and where to clip to the cable. Newton, however, watched as Kuykendall proceeded through the beginning of the course and directed him to his station from the ground before sending any campers onto the course. Newton's general practice was to have one of the summer staff help the volunteer do the transfer to their station because his line of sight from his position on the ground would not have been as good.

When Kuykendall arrived at his station, he saw the red marker at the end of the load-bearing cable closest to him but did not

_____

facilitators demonstrated to clip between the red markers. This affidavit contradicted Kuykendall's deposition testimony that he remembered little of the instructions given him, but clip to the red sounded familiar. Accordingly, the affidavit cannot create a genuine issue of material fact as to the instructions Kuykendall received. See Rohrbough v. Wyeth Laboratories, Inc., 916 F.2d 970, 975 (4th Cir. 1990) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." (internal quotation marks omitted)).

[2]The ropes course at Rockbridge consisted of seven "elements." Transitioning from one element to the next required participants to do a belay transfer to move from one cable around a tree to the next. Each participant has two carabiners, which he moves one at a time from one cable to the other, so that he remains attached to something at all times.

look any farther toward the other end to see where the other marker was located. Between that red marker and the tree at his station, Kuykendall saw two cables side by side. Kuykendall knew that there were cables or cable parts that were not weight-bearing on the Rockbridge course, and he knew that they were clearly labeled. Although he had seen tag ends at Windy Gap and knew that they "went up next to the rest of the cable," Kuykendall had never been instructed not to hook onto them. (J.A. at 256.) And it did not occur to him that one of the parallel cables at his station had to be the "tail end" or "tag end" of the excess cable.[3]

Kuykendall clipped both carabiners to one of the parallel sections of cable without "think[ing] about it." (J.A. at 291.) Initially, he was able to successfully assist campers with their belay transfers. When Kuykendall leaned back in his harness to demonstrate its safety to a timid camper, however, the cable to which he had attached his carabiners gave way, and he fell at least thirty feet to the ground. As a result of the fall, Kuykendall sustained serious injuries, necessitating surgery on his back and

---

[3]As explained below, one of the parallel cables was attached to the other by means of a lightweight piece of hardware called a "serving sleeve." During the course of this litigation, Hewett identified a photograph of the serving sleeve at the time of Kuykendall's accident; the serving sleeve had red tape around it. Kuykendall did not mention noticing the serving sleeve in his deposition. In his subsequently submitted affidavit, however, Kuykendall stated that the cable to which he attached his carabiners "appeared secured by a red sleeve and marked with red tape," leading him to believe that it was weight bearing. (J.A. at 618.)

wrists, as well as extensive rehabilitation. It was later determined that the fall occurred because Kuykendall had clipped his carabiners to a section of the cable that was not weight-bearing.

C. <u>Construction and Design of the Rockbridge Ropes Course</u>

An outside professional, Randy Smith of Inter Quest, constructed the ropes course at Rockbridge in March of 2000. The construction followed standards set by the Association for Challenge Course Technology ("ACCT"), which "detail common and recommended practices in challenge course construction, inspection and operation." (J.A. at 102.)

Strand vises[4] represent the primary means of securing the weight-bearing belay cables that run between trees. The strand vise is mechanically secured to the tree by a fastener that runs through a hole drilled in the tree. Excess cable runs through the strand vise and back around the tree, where it is fastened back to the belay cable by cable clamps located further from the tree than the strand vise. This fastening forms a back-up in case the strand vise fails.

Some of the excess cable necessarily extends beyond the cable clamps. The excess cable extending beyond the clamps (the "tail end" or "tag end" of the cable) is secured at its tip to the belay cable by means of a serving sleeve, a lightweight piece of hardware

---

[4]A strand vise is a metal grip connected to a bolt.

that is intended only to keep the tail end of the excess cable snug against the main cable, not to bear weight. (J.A. at 177.) Although construction standards specify that the excess cable extending beyond the cable clamps should be a minimum of two inches, there is no maximum length required or recommended.[5] A survey of the ropes course revealed lengths of excess cable between four and sixteen inches. The excess cable at Kuykendall's station at the time of his fall was fifteen inches long.

In an e-mail describing the results of an investigation into Kuykendall's accident, Robbie Robertson, Rockbridge's Property Manager, discussed the excess cable in detail. Robertson's e-mail explained that the excess cable between the clamps and the serving sleeve is meant to be parallel and snug, so that a carabiner will slide over both cables as a participant moves through the course. If the length of excess cable beyond the clamps is less than eight inches, the rigidity of the cables will prevent a participant from mistakenly inserting a carabiner over just one of the two parallel cables. With longer lengths of excess cable, however, there is enough slack between the cables for a participant to clip to only one. According to Robertson's e-mail, "[i]f this happens, there is a 50/50 chance that the carabineer [sic] will hook over the

---

[5]Young Life provided expert deposition testimony that the two inch minimum is not actually a standard of the Association for Challenge Course Technology ("ACCT"), but is rather a manufacturer's standard contained in an appendix to the ACCT standards.

excess cable run which is secured at one end only b[y] the serving sleeve, which is not designed to bear weight." (J.A. at 177.) This observation from the investigation into Kuykendall's fall led Rockbridge to examine every place along the course where it might be possible to hook a carabiner solely to an excess cable. Anywhere the length of excess cable beyond the cable clamps was more than eight inches, Rockbridge installed an additional serving sleeve at the midpoint, making it impossible to insert a carabiner over only one cable. Robertson recommended to other Young Life camps that they do the same because in-house discussion of possible remedies had revealed that some locations wrapped the cables in tape to keep them snugly together -- a remedy Rockbridge's former inspector indicated that he would not accept because the tape would prevent visual inspection of the cable and trap moisture, which could cause the cable to fail.

After Kuykendall's accident, Young Life added to its construction standards a requirement that the tag end of the excess table be no more than four inches in length.[6]

---

[6]In response to allegations from Kuykendall that the e-mail showed knowledge of a dangerous condition, Robinson submitted a declaration stating that he had not recognized any potential danger on the course at the time of the accident and was simply recommending that any camps that did not already use additional serving sleeves to keep the cables snug do so.

D. <u>Maintenance and Inspection of the Rockbridge Ropes Course</u>

In maintaining the Rockbridge ropes course, Young Life relied on both outside professionals and its own staff. A representative from Adventure Experiences, Inc., a full service challenge course construction company and ACCT professional vendor member, performed annual inspections. Young Life passed the 2003 annual inspection in March, three months before Kuykendall's accident. Young Life's staff also conducted monthly inspections of the course during the school year and daily visual inspections during the summer camp season. Hewett, who was a certified Adventure Experiences inspector, conducted a monthly inspection on May 20, 2003. Thereafter, facilitators and summer staff performed the daily visual inspections. In addition to conducting visual inspections of the ropes course on the days that he was at Rockbridge, Newton regularly reminded the summer staff to look around as they traversed the course to ensure that nothing looked out of place or potentially problematic.

Before Kuykendall's fall, there had been no major injuries on the ropes course. A few incidents had resulted in injuries such as a sprained ankle or a cut requiring a few stitches that were sufficiently minor to be treated on-site. None of these incidents, however, involved a fall from the course.[7]

---

[7]In addition, a camper was once injured on a separate portion of the challenge course called the "Big Swing"; another fell off a cargo net suspended four to five feet off the ground during an

11

There was no evidence that anyone at Rockbridge was aware of the gap between the cables before Kuykendall's accident or realized that he might unwittingly clip to the tail end of the excess cable. Newton did not remember looking for a gap between the tail end of the excess cable and the main cable as being a specific part of his training. Nevertheless, he believes that if he had noticed such a gap, he would have reported it to Hewett. Although Hewett was aware that excessive space between the two cables could pose a problem, that issue was not "on [his] radar" before the accident occurred. Still, Hewett felt confident that if he had seen slack in the excess cable creating excessive space between the tail end and the main cable, he would have done something about it.

### E. Training of the Rockbridge Staff

Both Newton, the facilitator on duty when Kuykendall fell from the course, and Hewett, the challenge course manager (who was not at Rockbridge on the day of the accident), had undergone ropes course training. Newton completed 30 hours of training in March of 2003 from Adventure Experiences. Upon completion of this training, he passed a test with written and practical components and received a certification. Hewett had extensive training and experience, having worked for Adventure Experiences for seven years as wilderness director of their Colorado camp prior to his employment with Rockbridge. As a refresher course, Hewett attended the March

activity that was not part of the challenge course.

12

2003 training program along with Newton.  Hewett and one or two of the facilitators at Rockbridge trained the summer staff on ropes course.

F. Expert Deposition Testimony & Declarations

Daniel Pervorse of Signature Research, a company which provides challenge course construction and design, offered expert deposition testimony on behalf of Young Life.  Pervorse had extensive experience in challenge course training, operation, and design.  He stated that it was appropriate to train ropes course participants where to clip in without also discussing where they should not clip because discussing what participants should not do might lead them to make mistakes.  Thus, Pervorse found no fault with Young Life's instructing ropes course participants to clip to the weight-bearing cables without specifically instructing them not to clip to the portion of the excess cable that was not weight-bearing.  Pervorse also believed that Newton had used appropriate judgment in working with Kuykendall, although it did appear that Newton had not adhered to Young Life's site specific procedure for the activity in which Kuykendall was engaged.  Pervorse testified that although he would expect a course builder to recognize and correct a gap between the main cable and the end of the excess cable, he would not typically have expected a course facilitator to do the same because if the facilitator had told participants where

13

to clip in, the gap would be a non-issue, since participants would know to clip in beyond it.

In contrast, Kenneth Jacquot, who, like Pervorse, had worked in the challenge course industry for a number of years, submitted an expert declaration on behalf of Kuykendall. Jacquot's declaration stated that any ropes course that did not have a challenge course manager who understood the danger of a gap between the main cable and the end of the excess cable should be shut down until staff had sufficient training to recognize the condition.[8]

Jeffery Boeke, CEO of ABEE, Inc. (an accredited professional vendor member of ACCT), who had over twenty-five years experience in challenge course training, construction, and inspection, also

---

[8]Jacquot opined that the suggestion in Robertson's e-mail that a person in Kuykendall's position on the day of the accident would have a fifty percent chance of hooking to the non-weight-bearing cable was correct and that subjecting someone to that risk "approaches, if not reaches, willful recklessness." (J.A. at 610.) Jacquot also stated that Rockbridge had "numerous separate violations of the ACCT standards under which it said it was operating," but did not specify which standards Rockbridge violated or what conduct constituted the violations. Instead, he further opined that the alleged violations evidenced "a degree of negligence showing indifference to another and an utter disregard of prudence which amounts to a complete neglect of the safety of such other person" and that "this degree of negligence would shock fair-minded people" and "approach, if not reach, a degree of negligence constituting wilful [sic] recklessness." (J.A. at 610.) On appeal, Kuykendall does not contend that Jacquot's conclusory statements regarding the degree of alleged negligence are sufficient to create a genuine issue of material fact -- a wise move, given that it is well settled that a party "cannot assure [it]self of a trial merely by trotting out . . . [an] expert's naked conclusion about the ultimate issue." Weigel v. Target Stores, 122 F.3d 461, 469 (7th Cir. 1997) (internal quotation marks and citations omitted).

14

submitted a declaration on behalf of Kuykendall. Boeke stated that Newton's failure to accompany Kuykendall to his station demonstrated an absence of adequate training and supervision.

## G. The Present Litigation

On June 20, 2005, Kuykendall filed suit against Young Life in the United States District Court for the Middle District of Florida, invoking the district court's diversity jurisdiction.[9] In an amended complaint filed July 25, 2005, Kuykendall asserted claims of Gross Negligence (Count I) and Willful and Wanton Negligence (Count II) against Young Life.

On September 9, 2005, the district court granted Young Life's motion to transfer the case to the Western District of Virginia. After the transfer, Young Life amended its answer to raise Virginia's charitable immunity doctrine as an affirmative defense against "any acts or omissions of simple negligence attributable to Young Life." (J.A. at 17.)

Following discovery, in July 2006, Young Life moved for summary judgment.[10] The district court granted the motion in a

---

[9]Kuykendall is a citizen of Florida and Young Life is a Colorado non-profit organization with its principal place of business in Colorado. Kuykendall's complaint sought $2.5 million in damages, an amount well in excess of the amount in controversy requirement codified in 28 U.S.C.A. § 1332 (West 2006).

[10]Young Life submitted declarations in support of its summary judgment motion seven days after filing the motion itself, after the deadline for the filing of dispositive motions. Young Life also submitted supporting exhibits with its Reply to Kuykendall's Response to the motion. On appeal, Kuykendall objects to Young

memorandum opinion and order dated November 7, 2006. Kuykendall timely noted an appeal, and we possess jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 2006).

## II.

## A.

We review <u>de novo</u> the district court's grant of summary judgment to Young Life, applying the same standards that the district court was required to apply. <u>See</u> <u>Laber v. Harvey</u>, 438 F.3d 404, 415 (4th Cir. 2006) (en banc). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Id.</u> (quoting Fed. R. Civ. P. 56(c) (West 1992)). As noted, we construe the evidence in the light most favorable to Kuykendall, the non-moving party, and draw all reasonable influences in his favor. <u>Id.</u>

## B.

As an initial matter, we must briefly address Kuykendall's argument that the district court misapplied Virginia's charitable

---

Life's "tactics" in timing the submission of the declarations. Because he never objected to the district court's consideration of this evidence, however, he has waived any argument that it should not form part of the record. Also, we note that Young Life claims Kuykendall did not previously object because Young Life's evidence responded to depositions Kuykendall conducted well after the discovery deadline had passed.

immunity doctrine.[11]  Under Virginia law, a charitable institution is immune from liability to its beneficiaries for the negligence of its servants or agents, provided that the charity has exercised due care in their selection and retention.  See Cowan v. Hospice Support Care, Inc., 603 S.E.2d 916, 918 (Va. 2004).  Virginia recognizes three levels of negligence, and the doctrine shields charities from liability only for the first -- simple negligence; it does not extend to gross negligence or willful and wanton negligence.  Id. at 919 (holding that "the public policy rationale that shields a charity from liability for acts of simple negligence does not extend to acts of gross negligence and willful and wanton negligence").

Contrary to Kuykendall's repeated assertions, the district court did not grant summary judgment to Young Life on the basis of Virginia's charitable immunity doctrine.  The district court simply noted that "Kuykendall [did] not contest the application of Virginia's charitable immunity doctrine," but rather "argue[d] that the facts [were] sufficient to prove gross negligence."  (J.A. at 669.)  The district court properly recognized that Virginia's charitable immunity doctrine did not apply to Kuykendall's claims of gross negligence and willful and wanton negligence and was

---

[11]Because the accident in question occurred in Virginia, that State's substantive law governs Kuykendall's complaint.

therefore irrelevant to its analysis of those claims.[12]  By failing

to pursue a simple negligence claim, Kuykendall has waived any

argument that "there is an obvious need to create further[]

contours in the [charitable immunity] doctrine," (Appellant's Br.

36), which he believes should not cover dangerous activities

conducted by charities.[13]

C.

We therefore turn to the single, dispositive issue in this

appeal -- whether Kuykendall presented sufficient evidence for a

reasonable jury to conclude that his fall from the ropes course

resulted from Young Life's gross negligence or willful and wanton

negligence.   As explained above, Virginia law recognizes three

levels of negligence.  The first, simple negligence, "involves the

---

[12]Kuykendall argues that the district court disregarded Cowan
v. Hospice Support Care, Inc., 603 S.E.2d 916 (Va. 2004) by failing
to focus on the nature of the activity conducted by Young Life.  In
addition to mischaracterizing the district court's order, this
contention misconstrues Cowan, which never suggested that courts
should consider the services provided by the charity in determining
the applicability of the charitable immunity doctrine.  Rather, the
Virginia Supreme Court in Cowan considered the nature of the
conduct involved in the three levels of negligence recognized under
Virginia law to determine whether the charitable immunity doctrine
should apply to all three, or only to simple negligence.  Id. at
918-19.

[13]Kuykendall did argue before the district court that the ropes
course was an ultrahazardous or inherently dangerous activity for
which strict liability might be appropriate.  The district court
rejected that argument on the ground "the hallmark of an
ultrahazardous activity is the inability to eliminate the risk
through the exercise of reasonable care," (J.A. at 670 (internal
quotation marks omitted)), and Kuykendall has not appealed that
ruling.

18

failure to use the degree of care that an ordinarily prudent person would exercise under similar circumstances to avoid injury to another." Cowan, 603 S.E.2d at 918. The second level, gross negligence, represents "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." Id. "This requires a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness." Id. The third level, willful and wanton negligence, involves "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." Id. at 919 (internal quotation marks omitted).

The district court concluded that the evidence could not support a finding that Young Life was indifferent or apathetic toward Kuykendall's safety and that it was therefore insufficient to prove gross negligence. The district court agreed with Kuykendall that multiple acts of simple negligence can amount to gross negligence, but stressed that this can only be the case if the cumulative effect of the negligent acts demonstrates an utter disregard of prudence amounting to an indifference to the plaintiff's safety. See Ferguson v. Ferguson, 181 S.E.2d 648, 652

19

(Va. 1971) (explaining that "the cumulative effect of several acts of negligence may constitute gross negligence, . . . not because of the number of acts of simple negligence, but because the cumulative acts, when taken together and considered under the facts and circumstances of the case[] under review, did constitute gross negligence"). The court noted that Young Life had made efforts to provide for Kuykendall's safety by hiring an expert to examine the course less than two months before Kuykendall fell, giving facilitators more than 24 hours of training, and allowing only experienced, trained volunteers to assist the facilitator. In addition, the facilitator instructed the leaders and campers regarding proper techniques for clipping into and maneuvering through the course. Ultimately, it concluded that the evidence could not support a finding of gross negligence.

Kuykendall argues that the district court erred in concluding that he had not presented sufficient evidence to raise a genuine issue of material fact as to whether Young Life committed several negligent acts which, taken together, show the "utter disregard of prudence that amounts to a complete neglect of [his] safety," Cowan, 603 S.E.2d at 918, necessary to prove gross negligence. In support of his argument that Young Life committed various negligent acts and omissions, Kuykendall asserts that: (1) because there was no need for the excess cable beyond the serving sleeve to be longer than eight inches, the fifteen inch excess cable at Kuykendall's

20

station on the date of the accident represented a known latent defect that Young Life failed to remedy; (2) neither Young Life nor the third party vendor that designed and built the ropes course expressly informed Kuykendall that a gap had formed between the excess cable and the main cable; (3) Young Life failed to take reasonable precautions to discover the gap between the cables at Kuykendall's station; (4) Young Life's "clip to the red" policy was misleading especially because the serving sleeve holding the excess cable was marked in red tape; and (5) Newton watched Kuykendall from the ground rather than taking him to his station to ensure that he clipped in properly. According to Kuykendall, these five allegedly negligent acts and omissions add up to gross negligence on Young Life's part. We cannot accept this contention.

First, the record does not support Kuykendall's assertion that the 15-inch length of excess cable represented a known defect of which he should have been informed. Kuykendall relies heavily on Robertson's e-mail; the <u>post-accident</u> e-mail, however, does not demonstrate that Young Life knew <u>before the accident occurred</u> that (1) a gap had developed between the excess cable and main cable, or (2) its "clip to the red" instruction and accompanying demonstration of "where and how to clip properly," (J.A. at 667), would be insufficient to prevent a volunteer from unthinkingly attaching both carabiners to the non-weightbearing excess cable. In contrast, Newton and Hewett testified that they did not notice

21

the gap between the cables.  Newton also indicated that he did not understand the potential danger of such a gap before the accident. Thus, there is no evidence that Young Life recognized and deliberately ignored the condition leading to Kuykendall's fall. Cf. City of Lynchburg v. Brown, 613 S.E.2d 407, 410 (Va. 2005) ("'Deliberate conduct is important evidence on the question of gross negligence.'" (quoting Chapman v. City of Virginia Beach, 475 S.E.2d 798, 801 (Va. 1996))).

Second, we agree with the district court that Kuykendall's evidence could not support a finding that Young Life's acts and omissions, in total, reflected "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." Cowan, 603 S.E.2d at 918.  The Virginia Supreme Court has indicated that for the "cumulative effect of the[] circumstances" to constitute gross negligence, it must amount to "a total disregard of all precautions, an absence of diligence, or lack of even slight care."  Chapman, 475 S.E.2d at 801.  Compare Brown, 613 S.E.2d at 410 (holding that a plaintiff who fell from a defective city-owned bleacher at a baseball game could not prove gross negligence and stressing that "there [was] no evidence of deliberate conduct by municipal employees or of a total disregard of all precautions by them"); Frazier v. City of Norfolk, 362 S.E.2d 688, 690-91 (Va. 1987) (holding that a child who fell from an orchestra pit eighteen

22

feet into a basement could not prove gross negligence, even though the city, which owned the building, was in violation of its building code because railings were not in place and a child had previously suffered a similar fall).

Here, Young Life presented uncontradicted evidence detailing its efforts to maintain the safety of the ropes course itself through regular inspections and the safety of campers and cabin leaders traversing the course through the assistance of trained staff. Prior to the summer camp season, certified inspectors had conducted both annual and monthly inspections of the ropes course. Thereafter, facilitators and supporting volunteers completed daily visual inspections. Newton, the facilitator on the date Kuykendall fell, had completed a thirty-hour training program and received a certification from an independent organization (Adventure Experiences). "Only experienced, trained volunteers assisted [Newton]." (J.A. at 670.) Moreover, before permitting Kuykendall to enter the ropes course, Newton "ma[de] sure [he] was making it clear to hook in between the reds" so that Kuykendall would clip to the safest portion of the cable. (J.A. at 339.) The many precautions Young Life took to ensure Kuykendall's safety preclude a finding that it demonstrated an "absence of slight diligence, or the want of even scant care." Chapman, 475 S.E.2d at 801 (internal quotation marks and citations omitted).

23

From our vantage point and with the benefit of hindsight, it seems clear that Young Life could, and perhaps should, have done more to prevent Kuykendall's fall and stave off the serious injuries that resulted. The precautions Young Life took to protect Kuykendall may well have been inadequate, but the standard for gross negligence is one of indifference, not inadequacy. A reasonable jury could not find, in the face of the safety measures Young Life employed, that Young Life's conduct evinced "a degree of negligence showing indifference to [Kuykendall] and an utter disregard of prudence that amounts to a complete neglect of [his] safety." Cowan, 603 S.E.2d at 918. Because Kuykendall cannot prove gross negligence, he cannot as a matter of law prove willful and wanton negligence.

## III.

In sum, we conclude that Kuykendall has waived his argument related Virginia's charitable immunity doctrine by failing to pursue a simple negligence claim in the district court. We further conclude that the district court did not err in finding Kuykendall's evidence insufficient to demonstrate that Young Life's acts and omissions rose to the level of gross negligence or willful and wanton negligence under Virginia law. Accordingly, the judgment of the district court is

AFFIRMED.

24